[No. S004649. Crim. No. 24058. May 11, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
WATSON ALLISON, Defendant and Appellant.

**COUNSEL**

Richard B. Mazer, under appointment by the Supreme Court, and David A. Nickerson for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William R. Weisman, Roy C. Preminger and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EAGLESON, J.**—Defendant Watson Allison was convicted of the robbery (Pen. Code, § 211)[1] and first degree murder (§ 187) of Leonard Wesley Polk. Defendant was found to have personally used a firearm in the commission of both offenses. (§ 12022.5.) One special circumstance allegation under the 1978 death penalty law was found true: that defendant committed the murder while engaged in the commission or attempted commission of robbery. (§ 190.2, subd. (a)(17)(i).) The jury fixed the penalty at death; this appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)[2]

For the reasons set forth hereafter, we affirm the judgment in its entirety.

### I. GUILT PHASE

#### A. FACTS

*Prosecution Case*

On November 11, 1982, Leonard Wesley Polk, aged 23, resided with his cousin, Angela Hunter, at 850 Orizaba Street, apartment number 7, in Long Beach. Hunter cleaned the apartment that morning and "everything was in perfect order" when she left for her 11:30 a.m. appointment at the hairdresser. Shortly before leaving she observed Polk talking on the telephone; he was dressed in jogging shorts and a T-shirt as if in preparation to ride his bike.

Neighbors Ray Johnson and Frank Aguayo lived in the apartment building and knew Hunter and Polk. On the morning of the robbery-murder, Johnson and Aguayo walked to a schoolyard one block away from their building, at 10th and Orizaba, to play basketball. Upon leaving the building they saw Polk across the street on his bicycle talking to two Black men in a gray Ford. Aguayo identified a photograph of accomplice Samuel Bonner as the driver of the Ford.

Johnson and Aguayo played ball for 30 minutes to an hour, returned to the apartment building, and stood outside on the street talking for several

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Codefendant Samuel Bonner was tried separately and convicted of first degree murder and robbery; his jury found that he had not personally used a firearm in the commission of the offenses. A felony-murder-robbery special circumstance was found true, but the prosecution elected not to seek the death penalty against Bonner, and he was sentenced to life imprisonment without the possibility of parole. His convictions have been affirmed on appeal.

minutes. During this time they observed Polk take his bicycle upstairs, leave in his car with another person, and return five to ten minutes later.

Johnson and Aguayo returned to their respective apartments. Less than one-half hour later, Johnson was sitting at his front window looking out at the street when he observed a man, whom he later identified as defendant, carry a television set out of the building and place it in Polk's white Toyota. Johnson recognized the television set as belonging to Hunter and Polk and told his wife to call the police. He continued watching from his window and saw defendant exit from the building again, this time carrying stereo equipment and speakers which he put into Polk's Toyota.

As soon as defendant departed, Johnson alerted Aguayo and together they went to Hunter's apartment, entered through the unlocked door, and saw Polk lying on the floor in the same clothes they had seen him wearing earlier. The furnishings and contents of the apartment were broken and strewn about. Aguayo testified that there was blood "everywhere," and that Polk was still "quivering." Aguayo tried to shake the victim, "and then [Polk's] eyes were really wide open." Aguayo directed other neighbors to summon paramedics, who arrived 15 to 20 minutes later.

Hunter returned sometime after police and medical personnel had arrived on the scene. She testified that Polk was lying on the floor next to a beanbag chair and shattered glass coffee table. There was no evidence of forced entry through either the front door or windows. Her stereo components, television set, and HBO cable receiver-box were among the items missing. Her large record album collection was strewn all over the room. Hunter had kept the original stereo component cartons and receipts which bore their serial numbers. She was thus able to positively identify her turntable, amplifier, receiver and speakers which were recovered and placed into evidence at trial. She did not know nor had she ever met defendant.

Long Beach Homicide Inspector William Collette arrived at the apartment approximately 2:30 p.m., after the emergency medical personnel had departed. Over 100 record albums were scattered around the living room. Collette found Polk lying on the floor in a pool of blood near a shattered glass coffee table, "apparently deceased." The walls and draperies were splattered with blood. A beanbag chair next to the victim was also covered with a large pool of blood.

Inspector Collette observed severe trauma to the victim's head. Medical testimony later established that Polk's death was caused by two .22-caliber gunshot wounds to the head: one to the left ear, the other to the left temple. The latter was a contact wound, evidencing that the weapon's muzzle had

been held very close to or in contact with the victim's head when the shot was fired. In addition, Polk had suffered numerous lacerations to his head, left ear and left side of his face, consistent with his having being struck by a fist or blunt object such as the butt of a handgun.

Based on Johnson's and Aguayo's statements, Inspector Collette began looking for Polk's white Toyota as well as the gray Ford described by them. The license number of a similar car had been noted by a patrol officer in the area that same morning. That car, a gray and black 1964 Ford, was located early in the evening outside what proved to be the residence where defendant was staying, and it was placed under surveillance. Accomplice Samuel Bonner was arrested when he attempted to drive off in the Ford later that night. Bonner furnished written consent to search the car the next day. On the seat of the car, Inspector Collette found a white envelope, addressed to defendant: "Mr. Watson Allison, 1700 Lemon Street," on the back of which was written in longhand: "10 ST" "Oriz" "Orizaba." At trial, an expert handwriting examiner testified that these words were written in defendant's handwriting.

Defendant was arrested on unrelated charges on November 18, one week after the murder, and placed in custody in the Long Beach city jail. He was fingerprinted by the Long Beach police crime lab the following day. Through comparison with defendant's known fingerprint card, expert testimony later established that a latent thumbprint lifted from the cellophane jacket of a record album at the murder scene was defendant's thumbprint.

Inspector Collette spoke with defendant at the jail on November 22. Defendant denied that he had been to Hunter's and Polk's apartment or even to the vicinity of 10th and Orizaba Streets in Long Beach on the day of the murder. He did, however, furnish written consent to search a garage he had rented at 1766 Lewis Street in Long Beach.

Richard Lee testified that he resided at 1766 Lewis Street, and had sublet a garage on the property to defendant on November 14, three days after the murder. Lee owned a truck, and on that same day defendant had "hired" Lee to move certain furniture and personal possessions from his (defendant's) Lemon Street address into the garage. Among the items moved into the garage were television sets and stereo components. The garage was padlocked and Lee retained a key. In mid-November Lee gave Inspector Collette written consent to search the garage, and accompanied the officers during their search. Hunter's stolen stereo and video components were recovered from the garage. Expert testimony established that a latent thumbprint lifted from one of the stereo components matched accomplice Samuel Bonner's left thumbprint. Polk's white Toyota was found parked

two blocks away; its stereo had been ripped from the dashboard and its rear speakers were also missing.

*Defense Case*

The defense case consisted solely of defendant's testimony. He admitted that he had been with Bonner on the day of the murder, November 11, 1982. On his way to the store that morning, he had allegedly run into Bonner talking on the telephone and, at Bonner's request, had written "10th and Orizaba" on the back of an envelope he had with him. Bonner never explained the significance of the notation he had asked defendant to jot down for him.

Bonner came over to the house defendant was staying at later that same morning. Bonner spoke with someone on the telephone, after which he and defendant discussed a plan to "rip-off" this person, Polk as it turned out, after gaining entry by ruse to his apartment. It was defendant's understanding that Bonner would "get him [Polk] in another part of the house, and I was supposed to come in the house and take whatever I wanted to take." Defendant testified he had no idea that anybody would get hurt as a result of the plan. Bonner had stated his intent to just "have some fun, you know. Just go upstairs with the guy."

Bonner drove defendant in Bonner's Ford to the vicinity of 10th and Orizaba Streets, where they stopped and spoke with Polk who was waiting on a 10-speed bicycle. Defendant never saw Bonner arm himself with a gun, nor did defendant own or have on his person a .22-caliber gun. Polk allegedly stated to Bonner, "Thought you was going to be by yourself." Bonner responded that defendant would be using his car and that Polk should meet them down the street at a gas station.

According to defendant, Polk went alone to his house, put away his bicycle, returned with his car to the gas station where defendant and Bonner were waiting, and drove away with Bonner. Bonner had told defendant to "give him about five or ten minutes and just come back around there," assuring defendant Polk's door would be left open.

Defendant testified that he put some gas in the Ford, drove back down the street, parked and waited for a few minutes, then walked to the apartment and opened the door. He knew which apartment to go to because he had seen Bonner and Polk enter while he was waiting. Upon entering, he observed Polk lying seemingly unconscious on a beanbag chair. Defendant did not expect to see Polk, who was not supposed to be in the room. When asked on direct examination: "You didn't know whether he was dead or

not?," defendant replied, "No. There wasn't no blood all over the place." Defendant testified Polk looked like he was "just knocked out." He denied shooting, hitting, touching, moving or coming into any contact with the victim. He testified he had not wanted to search Polk's body for money because "that would be robbery."

Defendant then looked around, grabbed the stereo speakers and went outside, only to find that Bonner's car was gone from where defendant had parked it. He returned to the apartment intending to steal Polk's bike, but saw Polk's car keys on the floor. In defendant's own words: "So I remember the car, and I take the car keys and the other speakers, go downstairs, put both speakers in the car, go back upstairs and take the components and put it in the trunk, and come back and take the TV, and I leave." Defendant testified he went through with the planned "rip-off" out of concern that Bonner would "probably tell some of the fellows that I punked the game" had he not carried through with it.

Returning home, defendant found Bonner parked in front of his house, and stated to Bonner: "Why you leave me, man? . . . [¶] I got all the stuff in this dude's car in the street, and I'm going to keep the component set, and you can do what you want with the TV. You shouldn't have left." Bonner allegedly indicated that "things didn't go too well," admitted he "scuffled" with Polk "a little bit" after trying to choke him, and "that was it." Bonner never mentioned anything about a shooting or a gun.

Defendant admitted that his prior statement to Inspector Collette in which he denied any involvement in the crime was a lie. He testified, "I wanted to see what he [Collette] was really talking about at first." When he spoke to police officers on November 22 and told them he had never been near the murder scene, he was unaware that the officers had found his fingerprints in the apartment. He was scared when he found out about the murder and "didn't want to get stuck with it."

The prosecution recalled Hunter on rebuttal. She testified that there was only one door to her apartment, and that although there was a sliding glass door leading to a side courtyard, the only way out except through the apartment door would be to jump over a fence, which would land one right in front of the apartment building's front door.

### B. GUILT PHASE ISSUES

#### 1. *Admission of Other-crimes Evidence*

■ Defendant contends that it was prejudicial error for the prosecutor to elicit testimony from Inspector Collette that he was in the county jail on

unrelated charges when first contacted. He asserts the jury may have speculated that he had been arrested for a similar or other unspecified crime. Because defendant failed to make a timely and specific objection below, the point must be deemed waived on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, defense counsel elicited the same information in his cross-examination of Inspector Collette, and defendant himself revealed on direct-examination that he was in jail on grand theft auto charges, and that he and Inspector Collette had gone to see "the tools I used to steal cars with. . . ." On this record there is no prejudice to defendant.

### 2. *Prosecutorial Misconduct*

Defendant asserts that the prosecutor committed misconduct during his cross-examination, and in his closing argument to the jury. Defendant complains that: "On cross-examination, the prosecutor repeatedly implied that [defendant's] testimony had been fabricated and that trial counsel had participated in manufacturing a defense which sought to avoid the death penalty." The record, however, fails to establish any such misconduct.

The prosecutor commenced his cross-examination of defendant as follows: "[Prosecutor]: Q. Mr. Allison, how old are you?

"[Defendant]: A. Twenty-five.

"Q. Mr. Goldstein has been your lawyer for many months now, hasn't he?

"A. Right.

"Q. You have trust in him and talked to him about your case and helped him prepare your defense?

"A. Yes.

"Q. You listened to him throughout the case and throughout the evidence?

"A. Yes.

"Q. What happened to the alibi defense we were going to hear?"

Defense counsel's objection that the line of questioning "Calls for conclusion, speculation, and there has never been any indication that there would

be an alibi defense offered," was initially sustained. Counsel's position, however, was made clear at the sidebar conference which followed; he urged that the prosecutor had no right to ask defendant why an alibi defense had not been forthcoming in his direct examination. The prosecutor in turn suggested, "Perhaps I didn't say it right," and explained that the intent of his question was to impeach defendant with his untruthful pretrial "alibi" statement to police, i.e., "[e]xplore the motive for changing the manner in which [defendant] indicated the events occurred." Defense counsel seemingly acquiesced when he stated, "One's the truth and the other isn't." The court ruled such line of inquiry unobjectionable, and defendant's cross-examination resumed.[3]

Clearly, the prosecutor never sought to imply that defense counsel was personally fabricating or withdrawing a planned defense, nor did defense counsel so surmise or object on such ground. ■ The prosecutor's attempt to point out the inconsistencies between defendant's extrajudicial statements and trial testimony was, of course, permissible impeachment. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 786 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Barker* (1979) 94 Cal.App.3d 321, 329-330 [156 Cal.Rptr. 407]; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 390 [136 Cal.Rptr. 45].)

Defendant argues that the following colloquy further establishes that the prosecutor was accusing defense counsel of collusion in fabricating a defense, and that the prosecutor improperly urged the jury to consider the question of penalty at the guilt phase: "[Prosecutor]: Q. And it's your testimony now, that although you participated in all the thefts involved in taking of the stereo and the TV and ultimately the car itself, that you had nothing to do with any of the violence?

"[Defendant]: A. No.

"Q. Now, at the time you first were given an opportunity to tell the truth by the police, you chose to tell them you weren't there.

"A. Right.

---

[3]The renewed questioning went as follows: "[Prosecutor]: Q. To clarify the meaning of my last question, when you were confronted with the officers' suspicion regarding your involvement in a murder on the 22nd of November, you indicated in no uncertain terms that you weren't there, and that's what's been kind of understood to be an alibi. [¶] In other words, you are not present at the crime scene, true? [¶] [Defendant]: A. Right. [¶] Q. And that was before you had a chance to speak to an excellent and very well respected attorney; isn't that right? [¶] A. Right. [¶] Q. But you knew what the truth was, didn't you? [¶] A. Yes. [¶] Q. So it doesn't take a lawyer to instruct you in truth. You know what happened. [¶] A. Yes. [¶] Q. But on the occasion of being given an opportunity to give the truth, you chose to lie about virtually everything? [¶] A. Right."

"Q. And after consulting with counsel, you have now decided in your evidence, at least, to tell the truth. [¶] You are now saying what you are saying is the truth?

"A. Yes.

"Q. And you understand by the nature of what you are saying now, that you are admitting participation in a crime leading to murder, but you are avoiding the death penalty, aren't you?"

Defense counsel objected on the ground that "the death penalty is not to be considered by the jury." There is no indication in the sidebar discussion which ensued that he understood the prosecutor's line of questioning as falsely accusing him of colluding with his client to fabricate a defense. Nor did counsel object on such ground. There is no improper inference to be drawn from the prosecutor's question, "[A]fter consulting with counsel, you have now decided in your evidence, at least, to tell the truth," to which defendant replied affirmatively. Indeed in his own examination of defendant, defense counsel elicited his affirmation that in preparation for trial he had been advised to tell the truth. If defendant ultimately chose to testify falsely at trial, it was not counsel's doing, nor did the prosecutor imply otherwise. But the prosecutor was plainly entitled to attempt to impeach any claimed defense.

■ Nor did the line of questioning improperly urge the jury to consider the question of penalty at the guilt phase. A defendant's possible punishment is not a proper matter for the jury's consideration in determining guilt or innocence. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 157, fn. 4 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Holt* (1984) 37 Cal.3d 436, 458 [208 Cal.Rptr. 547, 690 P.2d 1207]; *People* v. *Barclay* (1953) 40 Cal.2d 146, 158 [252 P.2d 321].) But the precise issue here is whether avoidance of the special circumstance was a possible motive for defendant testifying as he did. Given the fingerprint evidence which placed him in the murdered victim's apartment, and the booty recovered from his garage, defendant had little to lose by admitting complicity in the planned burglary and theft. But he might avoid a true finding on the felony-murder-robbery special circumstance, and thereby avoid the death penalty, if he could convince the jury he had no part in the robbery of the victim's person or the violence which ensued. The prosecutor theorized that such was a possible motive behind defendant's trial testimony, and he was entitled to attempt to establish the same through cross-examination of defendant.[4]

---

[4]Defendant points out that the trial court failed to instruct the jury with CALJIC No. 17.42, which explains that penalty should not be considered at the guilt phase. The jurors, however, were aware from the time of jury selection that there would be a second, separate

Defendant also asserts that the prosecutor in closing argument accused defense counsel of personally fabricating a defense. We do not so read the record.

The prosecutor argued to the jury: "In admitting that he went to the location with the specific intent to steal by whatever means necessary, all of the valuables from the victim intended, Mr. Polk, he refused to acknowledge and in fact emphatically denied any intention of taking money—money, the most liquid of substances, the most usable by the thief or a legitimate person for his own gain. . . . [¶] Oh, I wanted the stereo to sell for money, but I didn't want his money. I didn't want to touch his body. Didn't want to take anything from his pockets because that would be robbery. We have got a lawyer over there at the end of the counsel table defining robbery for us. *He* knows what robbery is and *he* knows what he has got to tell you to slide out and wiggle out from under a murder case." (Italics added.)

█ First and foremost, the failure to object or timely request an admonition regarding any aspect of the prosecutor's argument waived the claim of misconduct on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) In any event, in the context of the quoted passage it seems clear that the prosecutor's references to "he" were to the *defendant* and his chosen testimony ("he knows what he has got to tell you to slide out and wiggle out from under a murder case").[5] There was no misconduct.

Defendant's remaining claims of prosecutorial misconduct are likewise unavailing. █ At one point in his closing argument the prosecutor seemingly invited the jury to consider whether defendant's own testimony raised a reasonable doubt about his guilt. Defendant of course had no such burden (see, e.g., *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]). But since the prosecutor expressly acknowledged as much in his remarks directly preceding the improper comment, and in light of the

penalty phase if defendant was found guilty, and defense counsel cautioned them in his closing argument: "You are not to be concerned about what happens after you vote." In light of the whole record, the apparently inadvertent failure to give the instruction was clearly non-prejudicial. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 36-37 [188 Cal.Rptr. 77, 655 P.2d 279].)

[5] Later in his closing argument, when stressing that defendant had a tactical motive to concede the indisputable evidence by admitting his complicity in the lesser crimes of burglary and theft, the prosecutor explained that he was not suggesting any impropriety on the part of defense counsel: "We have the compromise known as confess and avoid. What does that mean? What's been done to your minds here? Give a little and take a little away. [¶] Two steps forward for every one step back. [¶] 'Okay. You got me. You have those witnesses. They are good. I couldn't break them down through my attorney.' And that's his job, you know. He is only doing his job. There is nothing said here that has anything to do with the ethics or conduct of [defense counsel]. He is doing his job. He doesn't tell his defendant what to say. That would be creating facts. He doesn't do that."

jury instructions given which properly defined the People's burden of proof, we find no prejudice.

Nor did the prosecutor in his rebuttal argument improperly comment on defendant's exercise of his privilege against self-incrimination. In his closing argument, defense counsel urged that the prosecution's case was defective because the prosecutor had failed to ask defendant how accomplice Bonner could have driven the Ford from the crime scene if defendant had the keys to that car and had not seen Bonner in the victim's apartment. In rebuttal the prosecutor merely responded to this argument, noting that he had no pretrial discovery of the defense and that defendant was in the best position to explain this point. Moreover, since there was no objection below, the argument is waived on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.)

■ There is no merit to defendant's further claim that the prosecutor wrongfully injected his personal opinion of defendant's guilt into his closing argument. In most of the complained-of instances the prosecutor merely used the pronoun "I" in his comments. Such phraseology hardly establishes impermissible expression of personal belief in the defendant's guilt. (See *People* v. *Adcox* (1988) 47 Cal.3d 207, 236-237 [253 Cal.Rptr. 55, 763 P.2d 906].) Examination of the prosecutor's closing argument demonstrates that he was merely presenting his views of the deductions and inferences warranted by the evidence. (*People* v. *Pineiro* (1982) 129 Cal.App.3d 915, 924 [179 Cal.Rptr. 883].)

■ Lastly, defendant contends that the prosecutor overstepped the bounds of fair comment by characterizing the death of the victim as a "Gestapo-style execution." There was no objection to such characterization below, hence the claim is waived on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) In any event, given the medical testimony that at least one of the bullets that killed Polk was fired at point-blank range into his head, the argument was not unrelated to the evidence. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 762-763 [114 Cal.Rptr. 467, 523 P.2d 267].)

3. *Instruction on Witness Credibility*

■ Defendant contends that the trial court erred in instructing the jury with CALJIC No. 2.21, to the effect that a witness willfully false in a material part of his testimony is to be distrusted in others.[6] He asserts there

---

[6]The jury was instructed, pursuant to CALJIC No. 2.21, as follows: "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars. [¶] However, discrepancies in a witness's testimony or between his testimony and

was no evidence in the record to support the giving of the instruction, and that it could have led the jury to discredit his own testimony on the basis of minor discrepancies in detail.

We disagree. CALJIC No. 2.21 has been repeatedly approved as a correct statement of the law, appropriately given where there is an evidentiary basis to support it. (See, e.g., *People v. Plager* (1987) 196 Cal.App.3d 1537, 1546 [242 Cal.Rptr. 624]; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 956 [196 Cal.Rptr. 412]; *People v. Lescallett* (1981) 123 Cal.App.3d 487, 492-493 [176 Cal.Rptr. 687]; *People v. Williams* (1975) 51 Cal.App.3d 65, 67-68 [123 Cal.Rptr. 891].)

Moreover, we are unpersuaded by defendant's reliance on dictum in *People v. Lescallett, supra,* 123 Cal.App.3d at page 493, for his assertion that the instruction should not have been given since he testified in his own behalf and the jury may have viewed it as directed principally toward his exculpatory testimony. Here, as in *People v. Goodwin* (1988) 202 Cal.App.3d 940, 945 [249 Cal.Rptr. 430], "Nothing in the language of the instruction itself improperly singled out [defendant.] By its terms, the instruction referred only to a 'witness' and not to anyone by name or legal status. The jury was also instructed that 'every person' who testified under oath is a witness (CALJIC No. 2.20), and that no statement by the court was intended to suggest that the jury should believe or disbelieve 'any' witness (CALJIC No. 17.30)."

There were at least two instances of material conflict in witnesses' testimony which justified the instruction.

First, a number of prosecution witnesses testified that there was a great amount of blood in the apartment after the killing. Defendant testified that he saw none when he entered. This was not a minor discrepancy, as the defense would have it. It was central to the credibility of defendant's version of events, in which he asserted he had no reason to suspect that Polk, lying on the floor, was in critical condition as defendant proceeded to steal the victim's stereo components and television set as planned.

Second, the reasonable inference to be drawn from Hunter's testimony concerning the layout of her apartment was that if Bonner indeed had entered the apartment as defendant claimed, he could not have left except

that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance."

through or past the front door. Defendant's testimony that he knew which apartment to enter because he saw Bonner and Polk go inside, if plausible, also suggested that the front door was not out of his sight until he made his own entrance—with Bonner allegedly nowhere to be found. Thus defendant's testimony was plainly in conflict with Hunter's testimony as well.

We conclude there was ample conflict in the testimony of the witnesses to support the giving of CALJIC No. 2.21.[7]

In a related argument, defendant also contends that the prosecutor improperly relied on the principles embodied in CALJIC No. 2.21 to urge the jury to disregard his trial testimony entirely because it was inconsistent with his pretrial statement to Inspector Collette. The record, however, does not bear out this claim. In arguing that defendant's extrajudicial statement to Inspector Collette was untruthful (a matter largely conceded by defendant at trial), the prosecutor urged the jurors to consider such fact as tending to show defendant's consciousness of guilt, not that they should use it to reject his entire trial testimony as false.

### 4. *Intent to Kill (Carlos Error)*

■ Defendant contends that the felony-murder-robbery special circumstance must be set aside on the ground that the court failed to instruct on intent to kill. In *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill is an element of the felony-murder special circumstance of the 1978 death penalty law, whether applied to accomplices or to actual killers. (*Id.*, at pp. 153-154.)

We have since overruled *Carlos* in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], wherein we held that, with respect

[7]We find the following observations of the court in *People v. Goodwin, supra,* 202 Cal.App.3d 940, 945, insightful and equally applicable here: "[Defendant's] position is, in essence, that there was too strong a factual basis which supported instructing the jury as to CALJIC No. 2.21, because [defendant's] testimony admittedly contained numerous conflicts and discrepancies which thus focused the instruction on his defense testimony. To the extent the instruction focused on the falsity and discrepancies in [defendant's] testimony, the instruction properly did its job. [Defendant] may well have been prejudiced. However, the prejudice arose not from CALJIC No. 2.21, but from the damning nature of [defendant's] own testimony.

"The weaknesses in [defendant's] testimony should not be ignored or given preferential treatment not granted to the testimony of any other witness. As it has been aptly noted in other contexts, a defendant who elects to testify in his own behalf is not entitled to a false aura of veracity. (*People v. Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1] [impeachment with prior conviction]; *People v. Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317] [impeachment with evidence of prior assaults on decedent].) [Defendant] was not entitled to have the jury determine his guilt or innocence guided by jury instructions which would ignore the false or inconsistent testimony of any witness, including [himself.]"

to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only where there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. (*Id.*, at pp. 1138-1139.) Here, however, the entire defense was premised on the assertion that defendant was an accomplice to the robbery, and not the actual killer.

The claim of *Carlos* error must nevertheless fail for two reasons.

First, the jury was charged with the standard felony-murder special-circumstance instruction, CALJIC No. 8.80,[8] followed immediately by the People's special instruction number one, which read: "To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved beyond a reasonable doubt, one, that the defendant Watson Allison had a specific intent to kill Leonard Wesley Polk, if he was the actual killer, or, two, that the defendant Watson Allison had a specific intent to aid in the commission of the killing of Leonard Wesley Polk, if he was not the actual killer." These two instructions, when read together as the jury was told they must do (see CALJIC No. 1.01), precluded any *Carlos* error.

Second, "the factual question [of intent] . . . was necessarily resolved adversely to the defendant under other, properly given instructions. . . ." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)[9] The jury found that defendant personally used a firearm in the commission of the robbery and murder, thereby determining that he was the actual killer. (See, e.g., *People* v. *Adcox, supra,* 47 Cal.3d at p. 247.)[10]

---

[8]The jury was instructed, pursuant to CALJIC No. 8.80, as follows: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if murder was committed under the following special circumstance, to wit: murder in the course of robbery with the intent to kill or the specific intent to aid in the killing. [¶] . . . If the defendant Allison was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant Allison. [¶] . . ."

[9]Defendant's claim that reversal is required under *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] fails, since the jury necessarily determined that defendant was the actual killer.

[10]Defendant challenges such use of the personal-firearm-use enhancement because of what he deems the jury's "inconsistent" rejection of the principal-arming allegation. There was no inconsistency; each enhancement finding stands or falls on its own. (§ 954; see *People* v. *Johnson* (1985) 174 Cal.App.3d 762, 768-769 [220 Cal.Rptr. 264]; *People* v. *Lopez* (1982) 131 Cal.App.3d 565, 569-571 [182 Cal.Rptr. 563].)

We have scrutinized the record and conclude that it establishes, beyond any doubt, that defendant acted with intent to kill in this case. Hence, the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] is satisfied. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689].)

## II. PENALTY PHASE

### A. FACTS

The prosecution presented no additional evidence at the penalty phase of the trial, resting entirely on its guilt phase evidence.

The defense presented the testimony of a single witness, defendant's mother. She testified that defendant's father was not in the household since he was four years old, and that she basically raised him herself. Although he might have gotten into some trouble as a youth, he was not a bad or violent child, and had helped with his two younger sisters. He had never been in prison before this case. Defendant left home when he was 17. He had a son, who was living with defendant's girlfriend in Arkansas, but defendant had helped to raise the child before they moved away from California. Defendant went to high school but did not graduate, and had taken some technical courses. Defendant was 25 years old at the time of trial.

Defendant did not testify in his own behalf at the penalty phase.

### B. PENALTY PHASE ISSUES

#### 1. *Constitutionality of the 1978 Death Penalty Law*

Defendant raises a number of challenges to the constitutionality of the 1978 death penalty law. He objects that the law does not require a finding of premeditation and deliberation as to felony-murder capital defendants. We have previously rejected the contention: "[T]he language and history of the statute establish beyond peradventure that premeditation and deliberation are not elements of the felony-murder special circumstance." (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 143 [249 Cal.Rptr. 320, 756 P.2d 1348].)

Defendant argues that the 1978 statute is unconstitutional because it fails to designate with specificity which factors are aggravating and which are mitigating, leading to a lack of uniformity in the imposition of the death penalty. This claim was put to rest in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440] (vacated on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct.

837]); see also *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1195-1196 (vacated and remanded on other grounds, *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

Finally, he asserts that the statute is unconstitutional because it fails to: (1) require written findings regarding the aggravating and mitigating factors found true; (2) require that aggravating factors be proved beyond a reasonable doubt; (3) exclude nonstatutory aggravating factors as a basis for the death penalty; and (4) require unanimity as to the aggravating factors supporting a death verdict. We have time and again rejected each of these identical arguments, and do so again. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1285 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

### 2. *Instructions on Mitigating General Character-background Evidence*

██ Under separate headings, defendant argues that the trial court misinstructed the jury on the proper role of general character-background evidence at the penalty phase, and that the prosecutor committed "misconduct" in his closing argument, exacerbating the error.

In reviewing such claim, we examine the instructions and arguments as a whole to determine whether the jury was adequately informed of the proper scope of mitigating evidence. (*California* v. *Brown, supra,* 479 U.S. 538, 546 [93 L.Ed.2d 934, 943 (conc. opn. of O'Connor, J.)]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-115 [71 L.Ed.2d 1, 10-11, 102 S.Ct. 869]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 777 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Brown, supra,* 40 Cal.3d at pp. 536-537, 544, fn. 17; *People* v. *Easley* (1983) 34 Cal.3d 858, 878, & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

We first observe that the jury was *not* instructed at the penalty phase with the "no-sympathy" language embodied in CALJIC No. 1.00. (Compare *People* v. *Brown, supra,* 40 Cal.3d at pp. 536-537, vacated *sub nom. California* v. *Brown, supra,* 479 U.S. 538 [93 L.Ed.2d 934] [wherein the high court held that the giving of the California standard antisympathy instruction (CALJIC No. 1.00) at the penalty phase is not itself unconstitutional per se].)[11]

---

[11] Defendant separately argues that the giving of CALJIC No. 1.00 at the guilt phase—with its standard no-sympathy admonition—may have had a prejudicial carry-over effect at the penalty phase. We have rejected this identical contention in previous cases. (See, e.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 102 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301].)

But here, defendant argues, the prosecutor commenced his closing argument by suggesting to the jury: "I think you ought to consider all of those other jury instructions you were given

■ The jury in this case did receive instruction in the unadorned, literal terms of section 190.3, factor (k). In *Easley, supra,* 34 Cal.3d 858, we found factor (k) (reproduced in former CALJIC No. 8.84.1) "potentially confusing" in that it spoke only of a "circumstance which extenuates the gravity of the crime." We therefore imposed the prospective requirement that "trial courts—in instructing on the factor embodied in section 190.3, [factor] (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (*Id.,* at p. 878, fn. 10.)

Nevertheless, our review of the arguments and instructions as a whole in this case reinforces our conclusion that the jury must have understood its obligation to consider and weigh all of defendant's mitigating evidence.

In discussing factor (k), the prosecutor told the jury: "*This is the area in the law that permits, for the first time in this case, the exercise of pity. Mercy.* [¶] What does it tell you? Any other circumstance which extenuates the gravity of the crime, even though it's not a legal excuse. [¶] *That catch-all factor [(k)] would seem to indicate that even if you don't find any legal excuse, you consider any other factor that tends to extenuate the criminal conduct.* [¶] *Well, if that broad door is open, what is there?* I suggest nothing to extenuate or justify this conduct, even though not a legal excuse. [¶] The fact that defendant grew up in a relatively broken home with no father— does that justify taking Leonard Wesley Polk's life with two bullets to the back of the head? Does it explain or in any way extenuate it? I suggest I [*sic*] doesn't. [¶] The fact that he was a relatively good son who cared for his younger siblings when he was in the home—does that justify the taking of Leonard Wesley Polk's life, even though not legally *in the moral sense? Is it okay for a kid from a rough background to take life like this? I suggest no.* [¶] *What is there if you can stretch your minds or imagination? What has been presented that shows you an extenuation, a mitigation, not legal, but perhaps moral or emotional?* [¶] *Anything at all that you can find?*" (Italics added.)

---

at the guilt phase that governs your conduct." Defendant urges such was an indirect invitation to the jury to improperly adhere to the command of CALJIC No. 1.00 at the penalty phase, namely, that they "not be swayed by mere sentiment, conjecture, sympathy, passion . . . ," and hence misconduct. Since there was no objection below, the prosecutor's comment cannot be assigned as "misconduct." (*People* v. *Adcox, supra,* 47 Cal.3d at p. 258; *People* v. *Green, supra,* 27 Cal.3d at p. 34.) And we observe that immediately following the complained-of comment, the prosecutor told the jury he was referring only to prior instructions concerning "Your attitude, your ability to speak to each other and be heard by each other in deliberation. . . ."

Later in his argument, the prosecutor again characterized factor (k) as "anything that would give you a moral excuse, not legally but something morally compelling that would say to you, 'Well, we can understand and possibly forgive here.'"

Defense counsel likewise urged the jury that factor (k) dealt with "whatever other factors you want to consider," and concluded, "I submit to you that [factor] k is the one that always leads towards mitigation."

Our review of the penalty phase arguments, considered together with the instructions as a whole, convinces us that the jury was adequately informed of the full nature of its responsibility to consider sympathy, general character and background evidence.

3. *Davenport Error*

During his penalty phase argument, the prosecutor reviewed factors (a) through (k) of section 190.3 and argued how, in his view, the evidence fit under each factor, if applicable. He reviewed the general circumstances of the crimes as aggravating circumstances under factor (a), explaining in no uncertain terms that he was seeking the death penalty primarily based on that factor alone.[12] He explained that the absence of prior violent criminal conduct (factor (b)) and prior felony convictions (factor (c)) were mitigating circumstances.

When he got to factor (d)—whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance—the prosecutor argued: "There is no evidence that this crime was anything but a cold-blooded and calculated offense from the planning stages through the completion. There is no evidence to show emotional disturbance or extreme mental distress or anything sufficient such as would lend us to, well, an understanding of the event because the person was under such stress. [¶] I suggest to you that when you calculate, as did [defendant], the death of his victim, *you must, in looking at that evidence, conclude factor* [(d)], cold-blooded and without emotional disturbance, *is a factor in aggravation*." (Italics added.)

Regarding factor (e)—whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act—the pros-

---

[12] The prosecutor argued: "Factor A, I put to you, tells you everything you need to know. It's the manner in which life was taken, the method used, the motivation for the taking of the life that tells you more than the lack of prior conviction or prior evidence of violence can tell you. [¶] The method and manner and mode of death of Leonard Wesley Polk bespeaks of nothing other than a cold-blooded execution of a human being. And it's the nature of the conduct that cries out for the ultimate penalty."

ecutor simply argued: "I think you have to find from the evidence you heard at the trial that you have just judged that Mr. Polk was nothing other than a victim. . . . [¶] The victim did not participate. . . ."

Regarding factor (f)—whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct—the prosecutor argued: "We have no evidence that there is a belief or moral justification of this conduct. I think your verdict bespeaks of the fact that you found it to be criminal conduct which is aggravated in nature, and since we have no evidence of what the defendant personally thought about it, other than his denial, I don't know if it would be fair to say that it's an aggravating factor or morally—place it in the neutral box because we haven't heard about it from the defendant." (Italics added.)

In discussing factor (g)—whether or not defendant acted under extreme duress or under the substantial domination of another person—the prosecutor characterized defendant as the "primary actor" in the murder, and labeled such "*a factor in aggravation.*" (Italics added.)

Finally, the prosecutor argued there was no evidence that defendant committed his crimes as a result of mental disease or defect, or the effects of intoxication (factor (h)), found defendant's age (factor (i)) to be a "neutral" factor, and reminded the jury they had determined at the guilt phase that defendant was the actual killer, not merely an accomplice (factor (j)).

█ Thus, the prosecutor labeled the absence of evidence under two factors—factor (d) (extreme mental or emotional disturbance), and factor (g) (acting under extreme duress or under the substantial domination of another person), as aggravating factors. Moreover, at the conclusion of his argument to the jury, he suggested that six of the eleven factors could be viewed as aggravating (*post,* at p. 905), which tally appears to have also included factors (e) and (h) as "aggravating." This constituted "*Davenport*" error. (*People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861].) In *Davenport* we held it improper for a prosecutor to argue that the mere absence of evidence of a statutory factor was itself an aggravating circumstance. (*Id.,* at pp. 289-290.)

The *Davenport* error here does not require reversal of the penalty verdict. Initially, we note that defendant is barred from complaining of any prosecutorial misconduct in this regard since he failed to object to the prosecutor's argument, and because a simple admonition would have readily clarified any confusion and cured any harm. (*People* v. *Green, supra,* 27 Cal.3d at p. 34; see *People* v. *Ghent, supra,* 43 Cal.3d at p. 777; *People* v. *Allen, supra,*

42 Cal.3d at p. 1284.) Moreover, this case was tried two years prior to our opinion in *Davenport.* Although we stated in *Davenport* that such argument "should not in the future be permitted" (41 Cal.3d at p. 290), we did not rely on the point in reversing the penalty judgment therein.

Turning to the question of prejudice, our review of the evidence, instructions, and arguments as a whole satisfies us that the prosecutor's express reference to the absence of mitigating evidence under factors (d) and (g) as "aggravating factors" could not, in reasonable possibility, have affected the jury's penalty verdict. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135].) In each instance the misnomer was directly preceded by argument in which the prosecutor urged that there was no evidence to make those two statutory factors relevant to the case. Thus he argued: "You must, *in looking at that evidence,* conclude [section 190.3, factor (d)], cold-blooded and without emotional disturbance, is a factor in aggravation." (Italics added.) And he argued that since the jury found the guilt phase evidence supported an inference that defendant was the actual killer, he had not been found to have acted under extreme duress or under the substantial domination of another person.

As we concluded in *People* v. *Walker* (1988) 47 Cal.3d 605, 644 [253 Cal.Rptr. 863, 765 P.2d 70], "Given the guilt phase evidence and verdicts, it is not reasonably possible that the *'Davenport'* error misled the jury in their task of weighing the applicable aggravating and mitigating circumstances." Moreover, we have held that the impact of so-called *"Davenport"* error may be reduced where the jury fully understood the weighing function and the scope of its sentencing discretion and responsibilities. (*Id.,* at pp. 644-645; see *People* v. *Brown, supra,* 46 Cal.3d at p. 456; *People* v. *Boyde* (1988) 46 Cal.3d 212, 263, fn. 4 [250 Cal.Rptr. 83, 758 P.2d 25] (conc. and dis. opn. of Arguelles, J.).) As next shown, there was no prejudicial *Brown* error (*People* v. *Brown, supra,* 40 Cal.3d 412) in this case.

### 4. *Sentencing Discretion*

▉ Defendant contends that as a result of the trial court's misinstruction, and the prosecutor's "misconduct" in his closing argument at the penalty phase, the jury was misled as to the full scope and nature of its sentencing responsibilities.

Although we found the statutory scheme of section 190.3 constitutional in *Brown,* "We acknowledge[d] that the language of the statute, and in particular the words 'shall impose a sentence of death,' leaves room for some confusion as to the jury's role." (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Our concern in *Brown* was that former CALJIC No. 8.84.2,

which was drawn verbatim from the statutory language, might mislead the jury in fully comprehending its sentencing discretion and responsibility in two interrelated ways:

"First, we pointed out that the jury might be confused about the nature of the weighing process. As we observed: '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of an imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider.' [Citation.]

"Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances' (italics added), could mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion. Instead we stated: 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" the mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the weighing process, *he decides that death is the appropriate penalty under all the circumstances.* Thus *the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case.*'" (*People* v. *Allen, supra,* 42 Cal.3d at p. 1277, italics in original.)

Our review of counsel's arguments in this case reveals nothing which would have confused the jury regarding the proper nature of the weighing process, our first concern in *Brown*. The prosecutor did not suggest that the weighing process was a mere "mechanical" or "counting" process. He told the jurors their "ultimate job" was to weigh the statutory factors in aggravation and mitigation, and urged them to: "Look, if you will, carefully at each of the things the court will allow you to examine, and decide for yourself the weight to be given to each of those factors." He explained: "So you have right now, you understand, the numbers, the six [aggravating] to

two [mitigating] situation. But that is not the basis upon which I will ask you to vote to take a life, because it's six to two. [¶] It's not the numbers that matter, ladies and gentlemen. It's the conduct, the actual real moral gravity of the conduct that really is what it's all about here. [¶] Six to two means nothing by itself."

This theme was reinforced by defense counsel in his closing argument: "Now, counsel says, don't add them up. I agree with that, and I told you that there were a few things we agreed upon. Don't add up the number of each side . . . . [¶] It's not a matter of balancing them. It's a matter of the relative weight that you give to all the factors. . . ."

We conclude that the jury was not misled into thinking that it must impose death if the aggravating circumstances *numerically outnumbered* the mitigating ones.

Turning to our second concern in *Brown*—whether the jury understood the full scope of its sentencing discretion as to the ultimate question it was being called upon to answer; which sentence to impose—our examination of the instructions and arguments as a whole convinces us that the jury was not misled as to its obligation to determine whether or not death was the *appropriate* penalty in this case.

We acknowledge that at the very outset of his closing argument, the prosecutor told the jury: "And when you weigh [the statutory factors], if you find the aggravation outweighs the mitigation, you must vote for death. The word is 'shall' in the instruction."

"As we stated in *Allen* and *Hendricks* [*People* v. *Hendricks* (1988) 44 Cal.3d 635 (244 Cal.Rptr. 181, 749 P.2d 836)], however, it is not improper per se to instruct the jury that it 'shall' impose death. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1279, and fn. 38 [prosecutor argued, 'Shall, not may, not might, not maybe. It is very explicit. If the aggravating evidence outweighs the mitigating evidence you shall return a verdict of death']; *People* v. *Hendricks, supra,* 44 Cal.3d at p. 653 [prosecutor emphasized mandatory 'shall' language and described the process as an 'automatic' one]; see also *People* v. *Grant* (1988) 45 Cal.3d 829, 857 [248 Cal.Rptr. 444, 755 P.2d 894] [prosecutor suggested that if the aggravating factors predominated, the law 'requires' imposition of the death penalty].)" (*People* v. *Adcox, supra,* 47 Cal.3d at p. 268 [prosecutor three times during his argument urged jury to follow mandatory statutory language, adding "you haven't any choice"].)

Although the prosecutor here told the jurors to follow the mandatory language of the law, the balance of his argument is replete with references to

the weighing function, inherent in which was their normative determination of appropriateness of penalty. He repeatedly emphasized the breadth of their sentencing discretion and gravity of the task at hand. Immediately after noting the mandatory language of the statute, he told the jury: "You are in the very real sense of the word here, now, the conscience of this community in a very real decision of life and death, and you should be cautious and careful as to how you decide what to do next." He later added: "[A]s the conscience of this community . . . you are asked to judge a life, and what to do with a life."

The prosecutor argued: "It's for you to decide ultimately whether the punishment should fit the crime or not. In light of these factors, you have the ultimate decision to make and probably the most serious one you will ever make in your lives." He later added: "[T]he point is simply this: I do not ask you here to coldly and abstractedly [*sic*] vote to take a life. I do not. [¶] I ask you to consider at the full depth of your understanding of these words, the full emotional and moral impact that they have on you, I ask you to consider what they really mean."

The prosecutor told the jurors their decision would not be a "joyful" or "emotionally gratifying" one, adding: "I charge you with the responsibility not of going joyfully into the jury room and voting to execute Watson Allison, but of going with the purpose of doing ultimate justice, if that is the appropriate thing in your individual and collective conscience. [¶] Don't shy away from it and expect it to be a joyful activity. Look, if you will, carefully at each of the things the court will allow you to examine, and decide for yourself the weight to be given to each of those factors, and be honest with yourselves and true to your conscience when doing so." He told the jurors to "consider carefully and completely all of these [statutory] factors," to "assign the appropriate moral legal weight to each of them," and to "listen to each other and examine your hearts."

Viewing the instructions and arguments as a whole, we are satisfied that the jury was not misled as to their sentencing discretion, and realized that the ultimate sentencing responsibility rested with them, and them alone. (*People* v. *Hendricks, supra,* 44 Cal.3d at p. 655.)

### 5. *Deletion of Nonapplicable Statutory Factors*

Defendant contends that the trial court erred in failing to delete the nonapplicable or irrelevant statutory aggravating and mitigating factors. (§ 190.3.) We have previously rejected this argument. (See *People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 776-777 [1977 death penalty law].) "[A]s is apparent from the statutory

language, it is for the jury to determine which of the listed factors are applicable or 'relevant' to the particular case. (§ 190.3, par. 6.)" (*Miranda, supra,* 44 Cal.3d at p. 105.)

### 6. *Ineffective Assistance of Counsel*

 Defendant argues that his counsel rendered ineffective assistance at the penalty phase by presenting only one brief witness, defendant's mother, in his defense.

The argument is wholly without merit. "It is established that reversal for ineffective assistance of counsel is generally unwarranted unless *the defendant* shows counsel's alleged failings *prejudiced* his defense. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 697, 104 S.Ct. 2052]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman* [1983] 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].)" (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1153 [245 Cal.Rptr. 635, 751 P.2d 901], italics in original.)

As in *Williams,* the record here contains no indication of what other mitigating evidence or witnesses might have been available to defendant and what, if anything, such additional evidence would have disclosed. (*Williams, supra,* 44 Cal.3d at p. 1153, and cases therein distinguished.) We reiterate that "[w]e cannot, and will not, predicate reversal of a judgment on mere speculation that some undisclosed testimony may have altered the result." (*Id.,* at p. 1154.) Defendant has failed to carry his appellate burden of demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

### 7. *Juror Inquiry During Penalty Phase Deliberations*

 Defendant asserts that the trial court committed prejudicial error by allegedly giving an "unresponsive answer," outside of his counsel's presence, to a written inquiry sent in from the jury room which read: "What are the ramifications should the jury be unable to reach a unanimous decision on this stage of the trial?"

The record is unclear on this point. The jury commenced its penalty phase deliberations on the morning of January 31, 1984, and the written inquiry described above, contained in the clerk's transcript on appeal, is so dated. Defendant's claim assumes that this written inquiry was the subject matter of the proceedings which took place at 3:35 p.m. on that same date, which were transcribed as follows:

"THE COURT: Matter of People against Allison.

"The record will indicate the defendant is present. Counsel are not. And we have 12 jurors and 3 alternates.

"*The question the court received is that at the present time the jury is tired. There is no comment the court can make on the question.*

"At this time, the court will excuse you tonight and order you back at 9:30 in the morning at which time you may continue deliberations.

". . . . . . . . . . . . . . . . . . . . ." (Italics added.)

Read in the context suggested by the Attorney General, the record could support an inference that "[t]he question the court received" was in fact a request by the jury that deliberations be adjourned for that day because the jurors were tired. On the other hand, the court's statement, "[t]here is no comment the court can make on the question," would seem out of place in that context. In any event, the fact remains that nowhere in the record is it indicated that the jury's written inquiry concerning possible deadlock was ever addressed by the court.

Even assuming on this record the inference urged by defendant, namely, that the court gave an "unresponsive answer" to the question concerning possible deadlock, no grounds for reversal are shown.

Although "it has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel. . . ," so that "'the trial judge [can] afford the parties an opportunity to be apprised of any such communication and to have the opportunity to make timely objection to any action by the court or jury which might be deemed irregular' (Citations)" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 848-849 [183 Cal.Rptr. 817, 647 P.2d 93], quoting *People* v. *Alcalde* (1944) 24 Cal.2d 177, 189 [148 P.2d 627]), here neither counsel's absence, nor the court's failure to directly respond to the inquiry, affected a substantial right of defendant such as would support a presumption of prejudice. (*People* v. *Hogan, supra,* 31 Cal.3d at p. 849.)

In *People* v. *Belmontes, supra,* 45 Cal.3d 744, we considered the matter of what, if any, would be the proper response to juror inquiries about possible deadlock during penalty phase deliberations. "We conclude[d] that such an instruction under the 1978 death penalty law would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process. Penalty phase juries are presently

instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further suggestion along the lines suggested herein [i.e., instruction in the full-blown language of the alternatives set forth in section 190.4, subd. (b)] could well serve to lessen or diminish that obligation in the jurors' eyes. (See *People* v. *Kimble* (1988) 44 Cal.3d 480, 511-516 [244 Cal.Rptr. 148, 749 P.2d 803] [1977 death penalty law]; cf. *People* v. *Gainer* (1977) 19 Cal.3d 835, 852 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73] [wherein we held erroneous any instruction which states or implies that a jury's failure to reach a verdict will necessarily require retrial].)" (*Belmontes, supra,* 45 Cal.3d at p. 814, fn. omitted.)

Defendant had no right to have his jury instructed in a more "responsive" manner concerning the subject of penalty phase deadlock. No prejudice from the court's handling of the jurors' inquiry is shown.

### 8. *Automatic Motion for Modification of the Penalty Verdict*

In every case in which the death penalty is returned, section 190.4, subdivision (e), requires the trial judge to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reason for his findings."

Defendant argues that the court considered inapplicable factors in reaching its decision to deny modification of the penalty verdict. He further asserts that the court failed to state adequate reasons on the record for denying the motion.

The court gave the following reasons for denying the automatic motion for modification of the verdict: "THE COURT: In this matter the court would not modify the jury verdict, because the court believes the verdict was proper and concurred in the verdict as far as the death penalty is concerned.

"The court believes further, in view of the criminal record of the defendant and the circumstances of this particular crime, there would be no basis to modify. The court thinks the verdict is warranted under the circumstances, in view of the evidence produced in the trial as indicated, and the factors in trial.

"And further, as far as the long and distinguished record of the defendant in the criminal annals of the county, I think that the defendant has now earned the verdict the jury has given him."

At the request of the prosecutor that the court "indicate on the record whether you concur with the jury's finding as a matter of law that the aggravating circumstances outweighed the mitigation factors adduced at the penalty phase of the trial," the court stated: "The court will so find."

We find our recent holding in *People* v. *Heishman* (1988) 45 Cal.3d 147 [246 Cal.Rptr. 673, 753 P.2d 629] controlling here. Defendant Heishman was convicted of murdering one Nancy Lugassy to prevent her from testifying in his criminal prosecution for raping her. At the postverdict sentencing hearing, the trial judge made the following record with respect to the automatic motion for modification of the penalty verdict: " '[L]et me tell you how the Court feels about this personally: There was a long trial in this court, and the jury found the defendant guilty of first degree murder. Then there was a penalty phase, and the jury came back with a definite mandate to the Court, asking and suggesting and recommending and actually naming the death penalty in this case. Now, under the circumstances, there not being any legal cause why this Court should set aside that, it is the Court's intention to go ahead and to impose the sentence, as mandated and as requested by the jury.' " (*Id.*, at p. 199.) Heishman was formally sentenced to death. Thereafter, at the request of the prosecutor, the trial court added for the record: " 'Well, with respect to the entire sentence, the Court has followed its duties under Section 190.4(e) and has made a determination . . . after considering and hearing all of the evidence, that the aggravated [*sic*] circumstances in this case most certainly do outweigh the mitigating circumstances.' " (*Id.*, at p. 200.)

We concluded in *Heishman* that the record made by the trial judge "made clear that he did in fact make that independent review [of the evidence] and determination [that the verdict was not contrary to the evidence or the law] as required by section 190.4(e)." (45 Cal.3d at p. 200.) We found it equally clear, however, that "the judge failed to comply with the statutory mandate to 'state on the record the reasons for his findings' and to 'set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes' (§ 190.4(e))." (*Ibid.*)

The question of remand for failure to state adequate reasons in *Heishman,* however, was complicated by the circumstance that the trial judge was deceased. We held: "Unfortunately, the trial judge is no longer alive. If he were, we would remand for a new hearing on the verdict-modification application simply out of an abundance of caution, since the trial judge's familiarity with the record would enable him to review the application and state reasons for his determination with relatively little delay and expenditure of judicial resources. But since the trial judge is deceased, we consider whether his failure to state his reasons under section 190.4(e) so prejudiced

defendant under the circumstances of this case as to necessitate reversal as to penalty. We conclude there was no such prejudice." (*Heishman, supra,* 45 Cal.3d at p. 200.)

The record and circumstances here are markedly similar to those in *Heishman.* Here the court expressly stated for the record that "the verdict is warranted under the circumstances, in view of the evidence produced in the trial as indicated, and the factors in trial," and went on—albeit at the prosecutor's request—to expressly concur in the jury's finding that the aggravating outweighed the mitigating factors adduced at the penalty phase of trial. Accordingly, as in *Heishman,* we conclude that the trial judge did in fact independently review the evidence and determine that the verdict of death was not contrary to the law or the evidence in the case.

We acknowledge that the court here indicated its further belief that "in view of the criminal record of the defendant," which it characterized as "long and distinguished . . . in the criminal annals of the county," defendant had "earned" his death verdict. Insofar as no evidence that defendant had a record of prior violent criminal conduct (§ 190.3, factor (b)) or prior felony convictions (factor (c)) was ever introduced at the penalty phase, the court's reliance on such matters was improper. Nevertheless, it is clear from the trial judge's statements on the record—particularly those made *prior* to his mention of defendant's criminal record—that although he believed defendant's criminal history had "earned" him the death penalty, he had independently concluded "the verdict [was] warranted under the circumstances, in view of the evidence produced in the trial as indicated, and the factors in trial." In short, "we cannot, on the facts of this case, conclude the error prejudiced defendant." (*People* v. *Brown, supra,* 46 Cal.3d at p. 462.)

It is equally clear, however, that the trial judge failed to comply with the statutory requirement and "state on the record the reasons for his findings." (§ 190.4, subd. (e); *People* v. *Heishman, supra,* 45 Cal.3d at p. 200.)

As in *Heishman,* the trial judge below is, unfortunately, now deceased. As we indicated in *Heishman,* were the trial judge still alive "we would remand for a new hearing on the verdict-modification application simply out of an abundance of caution, since the trial judge's familiarity with the record would enable him to review the application and state reasons for his determination with relatively little delay and expenditure of judicial resources." (45 Cal.3d at p. 200.)[13]

---

[13] The circumstances here are to be distinguished from the situation where "the trial judge dies or becomes unavailable *before the section 190.4(e) motion has been decided.* By analogy to other similar situations, the modification motion may in such event be heard and deter-

Because the trial judge is deceased, we consider whether his failure to state his reasons under section 190.4, subdivision (e) so prejudiced defendant under the circumstances as to necessitate reversal of the penalty verdict. (*Heishman, supra,* 45 Cal.3d at p. 200.) We conclude there was no such prejudice.

One aggravating factor was present: the circumstances of the present crime and special circumstance (felony-murder-robbery). (§§ 190.3, factor (a), 190.2, subd. (a)(17).) The evidence supports the jury's finding that defendant personally shot and killed his victim during the robbery; at least one of the shots having been fired execution-style at point-blank range into the victim's head. The evidence found at the crime scene, and the testimony of witnesses Johnson and Aguayo, established that Polk was lying in a pool of blood having just expired, or very near death, at the time when defendant was observed making several trips to and from the room in the apartment where the victim was found, carrying out the stereo components and television set to the victim's car.

The only mitigating circumstances claimed by defendant pertained to his character and background, relevant under factor (k). None of the statutory mitigating factors (see § 190.3, factors (d) through (j)) were even remotely applicable, except perhaps defendant's relatively youthful age (25 years old). Only one witness testified in defendant's behalf at the penalty phase; his mother. She testified he grew up without his natural father in the home, that although he may have gotten into some trouble as a youth he was not a bad child and had never been to prison, that he had helped with his two younger sisters while in the household, that he had a son who was living with the child's mother in Arkansas.

The trial judge's reasons for concluding that the jury's verdict of death was not contrary to law or the evidence in the case are self-evident from the record. (Cf. *People v. Heishman, supra,* 45 Cal.3d at p. 203.) Accordingly, we find defendant was not prejudiced by the trial judge's failure to adequately state his reasons for denying the automatic motion for modification of the penalty verdict.

9. *Proportionality Review*

 Defendant argues that his death sentence is "unconstitutionally arbitrary, discriminatory and disproportionate," and urges that we conduct

mined by any other judge of the same court. (§ 1053 [completion of trial]; Code Civ. Proc., § 661 [new trial motion]; *People v. Holzer* (1972) 25 Cal.App.3d 456, 463-464 [102 Cal.Rptr. 11] [same].)" (*People v. Brown* (1988) 45 Cal.3d 1247, 1264, fn. 7 [248 Cal.Rptr. 817, 756 P.2d 204], italics added.)

intercase proportionality review—i.e., an examination of whether imposition of the death penalty in his case is disproportionate to the penalties imposed on other persons who have committed similar offenses. It is settled that the Eighth Amendment requires no such comparison. (*Pulley* v. *Harris, supra,* 465 U.S. at pp. 51-54 [79 L.Ed.2d at pp. 40-43]; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Allen, supra,* 42 Cal.3d at p. 1285.)

He argues further that state and federal proscriptions against "cruel and unusual punishment" require that we conduct intracase proportionality review—i.e., an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others. (E.g., *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921].) He offers no analysis, however, of the facts supportive of such argument.

Defendant was found to have personally committed an execution-style murder in the course of a planned robbery of the victim. During the crimes, defendant personally removed the victim's stereo components and television set from the apartment, stole the victim's car, and shortly thereafter met up with accomplice Bonner, to whom he admittedly stated: "I got all the stuff in this dude's car in the street, and I'm going to keep the component set, and you can do what you want with the TV."

Nothing in the prior decisions of this court, or of the federal courts, suggests that his punishment, as the actual killer, is constitutionally disproportionate to "the offense" or "the offender." (*People* v. *Melton* (1988) 44 Cal.3d 713, 771-772 [244 Cal.Rptr. 867, 750 P.2d 741].)

## III. CONCLUSION

We have found no prejudicial error at either the guilt or penalty phases of defendant's trial. The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kaufman, J., and Arguelles, J.,* concurred.

**KAUFMAN, J.,** Concurring.—I have joined in the opinion authored for the court by Justice Eagleson but, nevertheless, write separately to point out two rather fundamental misconceptions which underlie Justice Broussard's

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

concurring and dissenting opinion and which also at least partially underlie Justice Mosk's concurring and dissenting opinion.

First, it is not true, except in a very limited sense, that the function of the trial court when deciding the automatic motion for modification is to make an independent determination of the appropriateness of imposing the death penalty. Second, even when the trial judge has died, if the ruling on the automatic motion for reduction of penalty is so defective it cannot be upheld, the remedy is not a new penalty trial, but, rather, a remand to the trial court for a new hearing on the automatic motion by a substitute judge.

Under the 1977 death penalty law, Penal Code section 190.4, subdivision (e)[1] read in pertinent part: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to subdivision (7) of Section 1181. In ruling on the application the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and *shall make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts.* He shall state on the record the reason [*sic*] for his findings." (Stats. 1977, ch. 316, § 12, p. 1261, italics added.)

In accordance with the plain meaning of the 1977 language, the court was required in ruling on the automatic motion to make an "independent determination" of the "weight of the evidence." (*People v. Frierson* (1979) 25 Cal.3d 142, 193, fn. 7 [158 Cal.Rptr. 281, 599 P.2d 587] [conc. opn. of Mosk, J.]; see also *People v. Rodriguez* (1986) 42 Cal.3d 730, 793 [230 Cal.Rptr. 667, 726 P.2d 113].)

Justice Mosk's concurring opinion in *Frierson* carefully and accurately explained the trial court's function in ruling on the automatic motion: "[O]n the automatic motion for modification of the verdict provided by subdivision (e) of section 190.4, the stated function of the trial court is not to choose the appropriate penalty as a matter of first impression but simply to exercise its independent judgment 'as to whether the weight of the evidence supports the jury's findings and verdicts.' This, of course, is no more than the long-settled standard for reviewing *any* jury verdict on a motion for new trial based on insufficiency of the evidence. (*People v. Love* (1961) 56 Cal.2d 720, 728 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637,

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

fn. 2 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)" (*People* v. *Frierson, supra,* 25 Cal.3d 142, 193, fn. 7, original italics.)

The 1978 death penalty law did not enlarge the trial court's function in ruling on the automatic motion for modification under section 190.4, subdivision (e). In fact, the only significant change in language in that regard was the deletion of the word "independent" preceding the word "determination" so that the pertinent provision reads: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).)

The question that arose as a result of the language change was not whether the trial court's function was thereby intended to be enlarged but, rather, whether the change was intended to diminish the trial court's function. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 793.) This court resolved that question in the negative, stating: "We think that the present version of section 190.4, subdivision (e), *like the 1977 version,* requires that the trial judge make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law. One reason for this interpretation is that it harmonizes section 190.4, subdivision (e), with section 1181, subdivision 7, to which subdivision (e) refers. Subdivision 7 of section 1181 was adopted in 1951. In ruling on motions under that subdivision for modification of verdicts that called for the death penalty under former sections 190 and 190.1, which were in effect up to 1972, 'the trial judge ha[d] *the duty to review the evidence to determine whether in his independent judgment the weight of the evidence support[ed] the jury's verdict,* and if he decide[d] it d[id] not, he ha[d] the power to reduce the penalty to life imprisonment.' (*In re Anderson* (1968) 69 Cal.2d 613, 623 [73 Cal.Rptr. 21, 447 P.2d 117].) Moreover, in determining whether *in his or her independent judgment the weight of the evidence supported the verdict,* the judge was required to assess the credibility of the witnesses, determine the probative force of the testimony, and weigh the evidence. (*People* v. *Love* (1961) 56 Cal.2d 720, 728 [16 Cal.Rptr. 777, 366 P.2d 33].) By providing for automatic review of a death verdict under section 1181, subdivision 7, section 190.4, subdivision (e), must have intended that the trial judge exercise the responsibilities for *independent review* imposed by subdivision 7, notwithstanding the omission of the word 'independent' that appeared in the 1977 version of section 190.4, subdivision (e)." (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 793-794, italics added.)

Although the *Rodriguez* court used the somewhat ambiguous expression "requires that the trial judge make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law," it is clear from other language in the same paragraph (italicized above), the history of the language change made in the 1978 version, and the statutory language "make a determination as to whether the jury's findings and verdicts, . . . are contrary to law or the evidence presented," that the independent determination to be made by the trial court is as to the weight of the evidence, not a de novo determination of the propriety of the death penalty otherwise.

So, Justice Mosk's explanation in *Frierson* of the trial court's function in ruling on the automatic motion under section 190.4 was and is correct; it "is no more than the long-settled standard for reviewing *any* jury verdict on a motion for new trial based on insufficiency of the evidence." (*People* v. *Frierson, supra,* 25 Cal.3d 142, 193, fn. 7 [conc. opn. of Mosk, J.].)

It is well settled, of course, that where error invalidates a ruling on a motion for new trial based on insufficiency of the evidence, the proper remedy is to remand the case to the trial court for a redetermination of the motion. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 794; *People* v. *Love* (1961) 56 Cal.2d 720, 729 [16 Cal.Rptr. 777, 366 P.2d 33] [disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 637, fn. 2 (36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810)].) It is also well settled that if the trial judge is unavailable, the motion is properly redetermined by another judge of the court. (*People* v. *Holzer* (1972) 25 Cal.App.3d 456, 463-464 [102 Cal.Rptr. 11]; see also Code Civ. Proc., § 661; *Beck* v. *Superior Court* (1942) 20 Cal.2d 77, 81 [124 P.2d 9]; *Lacey* v. *Bertone* (1952) 109 Cal.App.2d 107, 111 [240 P.2d 395].) Thus, as this court noted in *People* v. *Brown* (1988) 45 Cal.3d 1247, 1264, footnote 7 [248 Cal.Rptr. 817, 756 P.2d 204]: "This case was tried in 1980 before Judge J. William Mortland of the Riverside County Superior Court. Judge Mortland still sits on that court, and he personally should consider the modification motion. This is the correct procedure wherever possible, but practical difficulties arise when the trial judge dies or becomes unavailable before the section 190.4(e) motion has been decided. By analogy to other similar situations, the modification motion may in such event be heard and determined by any other judge of the same court. (§ 1053 [completion of trial]; Code Civ. Proc., § 661 [new trial motion]; *People* v. *Holzer* (1972) 25 Cal.App.3d 456, 463-464 [102 Cal.Rptr. 11] [same].)"

Panelli, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment as to guilt and in the sustaining of the special circumstance finding.

I dissent, however, from the affirmance of the judgment as to penalty. It is clear that the trial judge erred when he failed to state his reasons for denying defendant's automatic application for modification of the verdict of death as required by Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)).

The error was particularly egregious in this instance, for the judge obviously did not recollect the facts. Whether he merely failed to recall the evidence, or actually had some other case in mind, we shall never know because of his death. He emphasized the "criminal record of the defendant," and again stressed "the long and distinguished record of the defendant in the criminal annals of the county." To the contrary, there was no evidence whatever concerning any prior violent criminal conduct by this defendant. He has never served time in prison nor been convicted of a felony. The prosecutor had so conceded in his argument to the jury in the penalty phase.

The foregoing error—revealing the judge's misconception of the evidence—cannot be deemed harmless. The judge's failure to specify reasons for denying modification—the comment he made being inaccurate—denied to defendant the objective analysis and "independent determination" required by section 190.4(e), and denied to this court assurance of the thoughtful and effective appellate review we are required to undertake when a man's life is at stake. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 794 [230 Cal.Rptr. 667, 726 P.2d 113].)

As I pointed out in my dissent in *People* v. *Heishman* (1988) 45 Cal.3d 147, 205 [246 Cal.Rptr. 673, 753 P.2d 629], this court cannot somehow sanitize the error by attempting to redetermine the application itself. Section 190.4(e) provides in relevant part as follows: "In ruling on the application, *the judge* shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . ., and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. *The judge* shall state on the record the reasons for his findings. [¶] *The judge* shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes." (Italics added.)

On its face, section 190.4(e) plainly gives the determination of an application for modification of the verdict of death to *the trial judge* and *the trial judge alone*—not to any judge and certainly not to an appellate justice or an appellate court. The reason for this is evident: the Constitution imposes a requirement of heightened reliability for a verdict of death; only the trial

judge has had the opportunity to observe the defendant and the demeanor of the witnesses; therefore, it is only that judge who can make a constitutionally adequate determination as to whether the defendant should be sentenced to death in accordance with the verdict.

In this case as in *Heishman, supra,* 45 Cal.3d 147, the trial judge is deceased. Once again we have only two valid alternatives, neither of which the majority consider. The first is to exercise our authority under Penal Code sections 1181, subdivision 7, and 1260, and reduce the sentence from death to life imprisonment without possibility of parole while at the same time affirming the judgment of guilt. (E.g., *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1034-1036 [245 Cal.Rptr. 185, 750 P.2d 1342] (conc. & dis. opn. of Mosk, J.) [concluding in a capital case that the judgment of guilt should be affirmed but that the sentence of death should be reduced to life imprisonment]; cf. *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898] [reversing a judgment with directions to the trial court to reduce a death penalty to life imprisonment in a case in which serious errors were committed but the overwhelming weight of credible evidence established guilt].) In the unusual circumstances presented by this case, such a procedure would serve the ends of justice and also avoid the necessity of conducting another penalty trial more than six years after commission of the crime.

The second alternative is to reverse the judgment as to penalty and to return the matter for a new penalty trial. I would not object to that result.

For the reasons stated above, I cannot join in the majority's conclusion that the trial judge's failure to state his reasons for denying defendant's section 190.4(e) application can be deemed harmless error. Accordingly, I dissent from affirmance of the judgment as to penalty.

**BROUSSARD, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment as to the guilt verdict and the special circumstance finding. I dissent from the affirmance of the penalty judgment. As Justice Mosk points out in his concurring and dissenting opinion, the trial judge failed to carry out the obligations imposed on him by Penal Code section 190.4, subdivision (e). In ruling on the automatic motion for modification of the penalty verdict, the trial judge failed to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3 . . . and state on the record the reasons for his findings." (Pen. Code, § 190.4, subd. (e).)

Not only did the trial judge fail to make a record demonstrating that he had reviewed the evidence and had been guided by Penal Code section 190.3, he made statements which indicated either that he was thinking of

another case, or was considering evidence outside the record in ruling on this case. The judge stated: "The court believes further, in view of the criminal record of the defendant and the circumstances . . . of this particular crime, there would be no basis to modify." Actually, there was no evidence properly before the court that defendant had *any* criminal record. The trial judge went on: "And further, as far as the long and distinguished record of the defendant in the criminal annals of the county, I think that the defendant has now earned the verdict the jury has given him." Again, there was no evidence properly before the court of *any* criminal record, long, distinguished or otherwise.

Section 190.4, subdivision (e) requires the trial court to make an independent determination of the appropriateness of the jury's verdict in light of the relevant evidence and the applicable law. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 793 [230 Cal.Rptr. 667, 726 P.2d 113].) The trial court must make an adequate record to assure meaningful appellate review of its determination. (*Id.* at p. 794.) When there is an inadequate record, we normally remand for a new hearing. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 200 [246 Cal.Rptr. 673, 753 P.2d 629].) When the trial judge has died, we have considered whether the trial court's error was prejudicial in light of all the evidence. (*Id.* at pp. 200-201.)

Since the trial judge in this case is no longer living, the majority undertake a prejudice analysis and conclude that any error in failing to make an adequate record or in considering matters outside the record was harmless. I strongly disagree. The majority rely on the judge's rote recitation that he concluded that the verdict was warranted by the evidence and factors presented at trial to dispel the suggestion that he relied on facts outside the record for his decision. (Maj. opn., *ante,* at p. 911.) This, of course, does not dispel the possibility that the judge had the wrong case in mind, and was thinking of the evidence presented at some other trial.

Further, the majority weigh the facts of the crime against defendant's relative youth and his character and background evidence, and conclude that the trial judge's reasons for denying the motion for modification of the death verdict ". . . are self-evident from the record." (Maj. opn., *ante,* at p. 912.) The majority fall into the same error as the trial judge in failing to consider defendant's lack of a criminal record as a circumstance in mitigation. (*Ibid.*) The majority also fail to consider that this was an ordinary felony-murder case; certainly a serious crime, but one which sadly is also relatively common. Nothing in the circumstances of the crime in any way sets it apart as particularly aggravated. This was a case in which a trial court not improperly influenced by irrelevant factors might well have exercised its discretion under section 190.4, subdivision (e) and modified the

penalty verdict. Accordingly, the trial judge's error cannot be deemed harmless. I would vacate the penalty judgment and remand the matter to the trial court for reconsideration of the motion.

Appellant's petition for a rehearing was denied June 29, 1989, and the opinion was modified to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.