Filed 1/8/24  P. v. Berg CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B322613 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. MA073101 |
| RONALD LEE BERG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Kathleen Blanchard, Judge.  Affirmed.

Spolin Law, Aaron Spolin and Jeremy Cutcher for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————

Appellant Ronald Lee Berg challenges his conviction of two counts of vehicular manslaughter with gross negligence. He raises claims of insufficiency of the evidence and instructional error. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

By Information filed February 1, 2019, Berg was charged with two counts of vehicular manslaughter while making an unsafe lane change (Veh. Code, § 22107) in violation of Penal Code section 192, subdivision (c)(1), and one count of hit and run driving resulting in death or serious injury to another person in violation of Vehicle Code section 20001, subdivision (b)(2). Berg's first trial ended in a hung jury. Upon retrial he was convicted of the two vehicular manslaughter counts and acquitted of hit and run driving.

The trial court sentenced Berg to a total prison term of five years four months.

The trial testimony established the following:

### Maciej Makowiecki

At around 6 p.m. on March 11, 2017, Makowiecki was driving westbound on Route 138 in Palmdale. Route 138 has two lanes in each direction, divided by a center median. Makowiecki was driving in the left lane. It was completely dark and drivers had their headlights on.

A dark-colored Camaro was in the left lane in front of Makowiecki; there was a small pickup truck between him and the Camaro. The three cars were going about 50 miles per hour. Makowiecki did not notice anything unusual about the Camaro or how it was being driven.

2

In the right lane ahead of Makowiecki was a large delivery truck.  As Makowiecki was "closing the distance" to the delivery truck, he noticed a burgundy-colored Subaru go past him in the right lane.  The Subaru was going about 10 miles faster than everyone else.  Makowiecki recalled paying attention to the Subaru that had just passed him on the right because he is "a careful driver" and was "aware of [his] surroundings."

The Subaru was trying to pass Makowiecki and the small pickup and Camaro in the caravan in front of him.  At the "last moment, [the Subaru driver] just cut to the left" from behind the delivery truck in front of the Camaro.  The Subaru "was trying to cut in front of the traffic and pass; you know, not to be stuck behind the truck."  The lane change was "[v]ery sudden" and "not more than a second."  Makowiecki referred to it as an "unsafe maneuver" and a "dick move."  When the Subaru changed lanes, the rear of the Subaru was "within feet" of the front of the Camaro.  Makowiecki did not know the distance precisely but he testified it was not "more than a car length."  He explained it "would be virtually impossible for [him] to give [the] exact distance.  And possibly the distance was changing as the maneuver was happening."  When asked how far he was from the Subaru when the lane change happened, he said, "it was a dynamic situation, but I would say between fifty and hundred yards; closer to fifty."[1]

---

[1]    During cross examination, Makowiecki was reminded by defense counsel that he testified at the prior trial that he was "maybe thirty to fifty yards" from the Subaru when the lane change happened.  He was also reminded that he previously told the police he was about 70 to 100 yards from the Subaru.

Immediately after the Subaru changed lanes, Makowiecki saw the Camaro veer "to the left with brakes locking—or the wheels had locked and smoking and skidding to the left . . . , rotating to the left, going into the median . . . turning 90-degrees, so now it's facing south . . . and then oncoming traffic—a small sized SUV, hitting it—t-boning it."  Makowiecki "instantly saw what was about to happen" so at this point, he "started traversing to the right . . . to the shoulder."  There was a "loud bang" as the "impact happened."  It sounded like an explosion and debris was "falling everywhere."  He said the impact happened within "two, three seconds" after the Subaru changed lanes.

Makowiecki then saw the Subaru "taking off."  In his "assessment of the situation at the time, . . . following the [Subaru's] dick move, [the Subaru fled, which was] something even worse."  He decided to follow the Subaru because he determined that was the right thing to do.  He saw the Subaru "kind of weaving . . . from one lane to the other."  Makowiecki accelerated to catch-up with the Subaru, which was going about 90 miles per hour, and finally reached an intersection with a traffic light, where he was able to take a photograph of the Subaru's rear license plate.  He then called 911.

Richard Saylor

On March 11, 2017, Saylor was traveling eastbound in light traffic on Route 138 at around 6 p.m. He was driving a P.T. Cruiser.  It was "dark."  Saylor observed a collision and a car came into his side of the roadway.  He attempted to brake (his skid marks were 57 feet length) but crashed into the car.

<u>Gustavo Escobedo</u>

At around 6 p.m. on March 11, 2017, Escobedo was also driving eastbound on Route 138 with his wife Miriam Contreras and two young daughters, aged 10 and four, when they were involved in a collision. He was driving a Ford Fusion. Escobedo did not recall getting into the accident. He remembered "people banging on [his] car" and him going in and out of consciousness. He recalled people removing his daughters from the car. A firefighter told him that his daughters were airlifted to a hospital and that his wife was killed in the accident. He had a broken leg, a shattered hipbone, fractured ribs, and a punctured lung. One of his daughters had a shattered ankle and knee, and lacerations to her head. His other daughter had serious brain injuries, became immobile and does not move or talk; she requires 24-hour care.

<u>Officer Jeremiah Hart[2]</u>

At 6:55 p.m. on March 11, 2017, California Highway Patrol Officer Jeremiah Hart was called to the scene of the collisions. The Camaro was in the middle of lanes and was "cut in half." A Ford Fusion was on the shoulder of the roadway and a P.T. Cruiser was off to the side. It was initially assessed that the Camaro had crossed over the median and into the eastbound path of the Ford Fusion.

One of the passengers in the Ford Fusion—Miriam Contreras—succumbed to her injuries at the scene. Firefighters extracted the driver of the Ford Fusion—Escobedo—and two "little girls," all of whom were airlifted by helicopter to hospitals.

[2]    Officer Hart died before retrial; his prior testimony was read into evidence by stipulation.

5

The driver of the Camaro—22-year-old Jesse Sandoval—also died at the scene; he was found "seated partially" with a seatbelt on and "partially laying on the ground."

About five days later, Officer Hart was contacted by Makowiecki, who provided a picture of the Subaru's license plate. Officer Hart ran the license plate number and determined the car belonged to Berg. He went to Berg's address and observed a red Subaru Forester in the driveway. Berg was cooperative, provided a statement, and allowed Officer Hart to look at the vehicle.

Berg told Officer Hart he "remembered being at that location at that time" but "did not see a traffic collision" and "remembered an incident of a road rage." He said there was a vehicle that was chasing after him, from what he thought was "due to a road rage incident that occurred behind him as he changed lanes." He recalled the lane change to Officer Hart—he said he "was coming up on a series of vehicles and he had to make a lane change. He said he checked his two spots [i.e.,] off of his front bumper and off his rear bumper before he made the lane change." Berg heard tires screeching behind him "within half a second" of the lane change "but when he looked back in his rear-view mirror, he didn't see anything." Berg told Officer Hart he did not hear the collision. Officer Hart thought Berg was not being honest when he said he did not hear the sound of the collision. When Berg noticed a car following him, he "attempted to accelerate to get away from the vehicle." He told Officer Hart he "had assumed that he had potentially cut somebody off, which had resulted in the tire screeching and that person had become upset at him and was likely the person now following him." Berg did not call the police when he thought he was being followed.

Officer Hart opined that Berg made a lane change in front of the Camaro, causing it to take evasive action, lose control, go across lanes, and hit the Ford Fusion.

Okorie Okorocha[3]

Okorocha, a forensic toxicologist, has "analyzed and investigated thousands of cases on just marijuana and driving and the blood results." He opined that the typical signs or symptoms of someone driving under the influence of marijuana includes "exceptionally slow driving, trouble maintaining lanes, swerving, moving in a serpentine motion, braking, or speeding up for no reason."

Okorocha reviewed the medical records and coroner's report for victim Jesse Sandoval, the driver of the Camaro. Per Okorocha, Sandoval had 99 nanograms per milliliter of THC[4] in his blood, which is "an extraordinarily high amount." There "would have to [be] very recent smoking to get to a level that high . . . . [¶] If you have a level that high, that means recent use. Recent use means there's a pharmacological effect and we know that marijuana causes distortions of time and space." The "drastically high" marijuana level would "undoubtedly" cause driving impairment.

Sandoval also had a "pretty low" level of Xanax in his system, about 18 nanograms per milliliter. A combination of

---

[3]     Okorocha was unavailable to testify at the retrial; his prior testimony was read into evidence by stipulation. Two lab reports analyzing a blood sample of Jesse Sandoval were also received into evidence by stipulation.

[4]     THC is short for tetrahydrocannabinol, the active ingredient in marijuana.

marijuana and Xanax would have "a synergistic effect" and the "pharmacological effect would be distortions of time and space." Okorie opined, "It would affect first the reaction time of the person, the perception as to the space or distance between the two vehicles, or the driver and the vehicle in front of him. Time would be distorted, in a sense you would think you have more time than you actually do to react." It may also "possibly" make a person think they had less time to react.

Okorocha had read and was questioned about a study conducted in 2016 by the American Automobile Association (AAA) and the National Highway Traffic Safety Administration (NHTSA).[5] The study concluded that "a quantitative threshold or per se laws for THC following cannabis use cannot be specifically supported." The study also concluded, "[W]hereas the impairment effects of various concentration levels of alcohol . . . are well understood, there's little evidence available to link concentrations of other drugs to driver performance."

The prosecutor asked Okorocha, "Isn't that [study's findings] exactly opposite of what you just said?" Okorocha replied, "I'm dealing with levels . . . I've never seen before. If there was a per se level, I would absolutely say that 99 nanograms per milliliter is above it." The prosecutor countered, "But what this [study] is saying is that per se levels, when it's having to do with marijuana, are not specifically supported. That we need to rely on other things such as [field sobriety tests], right? . . . How they were driving? Other effects that the drug

_____

[5] Okorocha testified the NHTSA "run[s] the show as far as laws being made and regulations for highways and driving." AAA has "an institute that tends to run studies on driving under the influence, reckless driving, things like that."

has on them, other than just saying you have a certain level, you are under the influence. It's not like alcohol; correct?" To which Okorocha responded, "Correct." Okorocha also agreed that some people can be at higher levels of marijuana and have no signs or symptoms of being under the influence, whereas some people with low levels can exhibit signs of being under the influence. Okorocha stated he "disagree[s] with NHTSA all the time." Okorocha opined that "[w]ith the levels in this case, I would absolutely say that the [AAA] and NTSA findings don't apply."

Okorocha testified that someone reacting within one-half of a second to being cut off was not a long time to react. When asked if half a second reaction time signifies someone that is "delayed in their movements or in their motions," he replied, "I wouldn't think so."

Berg did not testify. He called two character witnesses—Kasie Mummery and Kathleen Bonine—who attested to his truthfulness.

## DISCUSSION

### I. Substantial Evidence Supports the Convictions

Appellant argues insufficient evidence supports the convictions for vehicular manslaughter with gross negligence. We disagree and conclude the convictions are supported by substantial evidence.

#### A. Standard of Review

When reviewing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

9

We examine the record independently for substantial evidence—that is, evidence which is reasonable, credible, and of solid value that would support a finding beyond a reasonable doubt. (*Ibid*; see *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).) " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Reversal on the ground of insufficient evidence is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Cravens* (2012) 53 Cal.4th 500, 508; *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1171.)

B.    **Applicable Law**

Penal Code section 192, subdivision (c)(1), defines felony vehicular manslaughter as "driving a vehicle in the commission of an unlawful act, not amounting to a felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." The required act must either be "a misdemeanor or infraction" or "a negligent act." (*People v. Thompson* (2000) 79 Cal.App.4th 40, 53 (*Thompson*).)

The meaning of gross negligence has been explained many times. *People v. Bennett* (1991) 54 Cal.3d 1032, 1036 (*Bennett*), asserts: "Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I

10

don't care what happens." ' [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved." Gross negligence does not include "inattention, mistaken judgment, or misadventure . . . ." (*Id*. at p. 1037, fn. 3.) Gross negligence involves aggravated, reckless, or flagrant disregard for human life, or indifference to consequences of one's conduct. (*Thompson, supra,* 79 Cal.App.4th at p. 54.)

A defendant's particular mind state is also relevant. "In determining whether a reasonable person in [the] defendant's position would have been aware of the risks, the jury should be given relevant facts as to what [the] defendant knew, including [the defendant's] actual awareness of those risks." (*Ochoa, supra,* 6 Cal.4th at p. 1205, italics omitted.) Thus, while a defendant who lacks awareness of the risk may still be grossly negligent "if a reasonable person would have been so aware," a defendant who "actually appreciated the risks involved in a given enterprise, and nonetheless proceeded with it," could still be found grossly negligent even if "a reasonable person in [the] defendant's position would [not] have recognized the risk." (*Ibid.*, italics omitted.)

Put another way, gross negligence occurs when the defendant's acts are such a departure from what would be the conduct of " ' "an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." ' " (*People v. Alonzo* (1993) 13 Cal.App.4th 535, 540.) " 'The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen.' " (*People v. Clem* (2000) 78 Cal.App.4th 346, 352; see

11

also *People v. Odom* (1991) 226 Cal.App.3d 1028, 1032.)
A "finding of gross negligence required to convict a defendant of gross vehicular manslaughter . . . may be based on the overall circumstances surrounding the fatality." (*Bennett*, *supra*, 54 Cal.3d at p. 1040.)

"The finding of an operator's gross negligence in driving a motorcar, when supported by substantial evidence, is conclusive upon the reviewing court and can be reversed only when that court becomes convinced by the evidence that freedom from gross negligence was so clearly established that reasonable minds could not differ upon the question." (*People v. Flores* (1947) 83 Cal.App.2d 11, 14.)

C.   **Analysis**

Berg argues there was insufficient evidence to convict him. He contends that even "[a]ccepting the testimony of [Makowiecki], as the jury did, there is no evidence which can support a finding of gross negligence." He contends an objective person in his position, who was driving at a faster rate of speed and was already one car length ahead, would not have been aware of an enhanced risk of danger or death to human life from a lane change. Thus, there was insufficient evidence to show that the fatal consequence of the lane change could reasonably have been foreseen.

We disagree and find a reasonable jury could have found Berg was grossly negligent in making an unsafe lane change in front of the Camaro, which caused the collisions resulting in the deaths of Sandoval and Contreras.

The trial court instructed the jury with CALJIC No. 8.90, which provides that gross negligence "refers to a negligent act which is aggravated, reckless or flagrant, and which is such a

departure from the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for danger to human life or to constitute indifference to the consequences of those acts.  The facts must be such that the consequences of the negligent act could reasonably have been foreseen and it must appear that the danger to human life was not the result of inattention, mistaken judgment or misadventure, but the natural and probable result of an aggravated, reckless or flagrantly negligent act."  The jury was also instructed with CALCRIM No. 592, which provides that gross negligence "involves more than ordinary carelessness, inattention, or mistake in judgment.  A person acts with gross negligence when" he acts "in a reckless way that creates a high risk of death or great bodily injury," and "[a] reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he . . . acts is so different from how an ordinarily careful person would act in the same situation that his . . . act amounts to disregard for human life or indifference to the consequences of that act."

Here, viewing the evidence in the light most favorable to the jury verdict, we find there is substantial evidence to support Berg's conviction.  Makowiecki and Saylor both testified that it was "completely dark" around 6 p.m. on the date of the accident. Makowiecki testified that he did not notice anything unusual about how the Camaro was being driven.  Makowiecki further testified that everyone was going about 50 miles per hour, except Berg who was driving about 10 miles faster than everyone else. Makowiecki testified that Berg drove past him and "was trying to cut in front of the traffic and . . . not [be] stuck behind the truck."

13

Berg at the "last moment . . . just cut to the left" from behind the delivery truck to within feet of the front of the Camaro, which Makowiecki described as a "[v]ery sudden" (i.e., "not more than a second") lane change, an "unsafe maneuver," and a "dick move." Makowiecki also testified that the Camaro veered left and the brakes started skidding "immediately after" Berg's lane change, resulting in the collisions that claimed the two lives.

Given the darkness, Berg's faster speed, his abrupt lane change to within feet of the front of the Camaro, we conclude Berg demonstrated an "exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*Bennett*, *supra*, 54 Cal.3d at p. 1036.) Berg told Officer Hart that he "was coming up on a series of vehicles and he *had to* make a lane change. He said he checked his two spots [i.e.,] off of his front bumper and off his rear bumper before he made the lane change." (Italics added.) The jury could have reasonably rejected this assertion, as appellant did not explain why he "had to" make a lane change, much less one that could not be made with reasonable safety.[6] The jury could have further found Berg not credible in his statement to Officer Hart that he had "checked his two spots" before making the lane change, as the Camaro was "within feet" of his Subaru at the time of the lane change. This is made even more likely given Officer Hart's opinion that Berg was not being honest when he said he did not hear the sound of the accident despite hearing the "tires screeching behind him" seconds before.

---

[6] The jury was instructed that Vehicle Code section 22107 provides, "No person shall . . . move right or left upon a roadway until such movement can be made with reasonable safety."

14

Berg contends the fatal consequences of his lane change were "entirely unforeseeable, and occurred due to the severe impairment of Mr. Sandoval." We are not persuaded. A reasonable jury could have found that Sandoval's driving was not impaired, notwithstanding the marijuana in his blood. Makowiecki testified he did not notice anything unusual about how the Camaro was being driven. Plus, Okorocha confirmed that some people can be at higher levels of marijuana and have no signs or symptoms of being under the influence and some people with low levels can exhibit signs of being under the influence; whether Sandoval was indeed impaired was not established.

Lastly, the jury was instructed with CALJIC No. 3.41, which provides, "When the conduct of two or more persons contributes concurrently as a cause of the death . . . , the conduct of each is a cause of the death . . . if that conduct was also a substantial factor contributing to the result." This allows the jury to find or conclude that notwithstanding the marijuana in Sandoval's system, appellant's very sudden, unsafe lane change contributed to the accident/cause of death.

Based on the foregoing, we conclude substantial evidence supports Berg's convictions of vehicular manslaughter with gross negligence in violation of section 192, subdivision (c)(1). (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.) In light of our conclusion, we do not address Berg' alternative argument that the evidence is insufficient to convict him of the lesser included offense of vehicular manslaughter without gross negligence.

15

II.   **The Trial Court Did Not Err When It Declined to Instruct the Jury with CALJIC No. 2.21.2**

At the retrial, Makowiecki was asked how far he was from the Subaru when the lane change happened. He testified, "it was a dynamic situation, but I would say between fifty and hundred yards; closer to fifty." This was different from his testimony at the first trial in 2019 where he said he was "maybe thirty to fifty yards" from the Subaru when the lane change happened. It also differed from his statement to the police in 2017 that he was about 70 to 100 yards from the Subaru.

Berg asked the court to instruct the jury with CALJIC No. 2.21.2 as to Makowiecki's testimony. CALJIC No. 2.21.2 provides: "A witness who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

The trial court refused the instruction and stated: "My view of the evidence from the eyewitness in this case is certainly there were discrepancies in, for example, distance estimates that he gave at this trial versus to the police or in the prior proceedings, all of which really do fall in the same range, and he explained to the jury that his recollection two years later is different. That, to me, falls into the category of . . . commonplace misrecollection and things like that that the jury's already instructed on." The court observed that "[w]illfully false is something materially different" and that there is no "indication that [Makowiecki] is doing anything other than giving his best to try [to] remember now, however many, two, three years later. And he's been

16

basically consistent all along.  I just don't think that there's any evidentiary basis for giving that instruction, and I think that giving that instruction would be very confusing for the jury."

On appeal, Berg argues that once the trial court determined there were discrepancies in Makowiecki's testimony, it was required to instruct on willfully false testimony and its failure to do so is reversible error.

## A.  **Standard of Review**

We review the legal adequacy of jury instructions de novo. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Cole* (2004) 33 Cal.4th 1158, 1210.)  The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law." (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.)  " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole.  We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338; see also *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [explaining jurors are "presumed able to understand and correlate instructions"].)  "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

## B.  **Applicable Law**

CALJIC No. 2.21.2 describes a settled principle for evaluating witness credibility and is a correct statement of the law.  (*People v. Millwee* (1998) 18 Cal.4th 96, 159, fn. 28; *People v.*

17

*Beardslee* (1991) 53 Cal.3d 68, 94; *People v. Allison* (1989)
48 Cal.3d 879, 895 (*Allison*).)  It is phrased in neutral fashion and
applies to witnesses called by either side.  (*Millwee*, at p. 159.)
CALJIC No. 2.21.2 " 'does nothing more than explain to a jury
one of the tests they may employ in resolving a credibility
dispute.' " (*People v. Murillo* (1996) 47 Cal.App.4th 1104, 1108
(*Murillo*).)

    C.   **Analysis**

We agree with the trial court that there was no evidence
from which it could be inferred that Makowiecki willfully gave
false testimony.  CALJIC No. 2.21.2 should only be given when
there is an evidentiary basis to support it, and there was no
evidence from which to infer or find that any witness in this case
gave willfully false testimony.  (*Allison*, *supra*, 48 Cal.3d at
p. 895.)  Based on our review of Makowiecki's testimony at this
retrial in comparison to his prior testimony in 2019 and
statements to the police in 2017, we find there were no material
inconsistencies that triggered the court's duty to give CALJIC
No. 2.21.2.  The entirety of the record fails to reflect any
deliberate falsehoods, vague or improbable testimony, or even
inconsistencies that would have supported CALJIC No. 2.21.2.
During retrial, Makowiecki testified that the distance between
him and appellant's Subaru during the lane change was between
50 and 100 yards; he specifically said that it "was a dynamic
situation" changing with every passing second.  At the prior trial,
Makowiecki had testified that the distance was "maybe" 30 to 50
yards at the time of the lane change.  He had previously told the
police that he was about 70 to 100 yards from the Subaru.  These
estimates all fall within the same range — 50 to 100, 30 to 50,
and 70 to 100 yards.  Moreover, the passage of time—five years

18

since the accident—may also be a factor causing innocent misrecollection of the specific yard distance between Makowiecki and Berg's Subaru at the time of the lane change.

Makowiecki acknowledged the discrepancies between his current testimony, his prior testimony, and his initial statements to Officer Hart. He readily admitted his distance ranges were "estimates." Makowiecki's recollection of the distances between vehicles did not warrant an instruction on false testimony, particularly since he did not, in the end, testify to the distance that was most unfavorable to Berg.

However, assuming for the sake of argument that the trial court erred, the error was harmless. The trial court instructed the jury with CALJIC No. 2.20, which cautioned jurors to act as the sole judge of a witness's believability, including the "existence or nonexistence of any fact testified to by the witness." The jury was instructed it could consider "anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness." The court also instructed the jury with CALJIC No. 2.27, that the jury "should give the testimony of a single witness whatever weight [the jury] think[s] it deserves." The jury also heard CALJIC No. 2.13, which stated the jury can consider a witness's prior consistent and inconsistent statements "not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion." Finally, the court gave CALJIC No. 2.21.1, which provides, "Discrepancies in a witness's testimony . . . do not necessarily mean that any witness should be discredited. Failure of recollection is common. Innocent misrecollection is not uncommon."

These instructions rendered the jury well aware of its duty to assess the credibility and probative value of every aspect of Makowiecki's testimony. Jurors are presumed to be intelligent people capable of understanding and correlating jury instructions. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) Absent an indication to the contrary, we presume the jury followed the court's instructions. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

*Murrillo* is apt. There the court found harmless the trial court's failure to give CALJIC No. 2.21.2 because defense counsel was able to and did argue the substance of the instruction to the jury and the court charged the jury with other instructions covering the same ground, including CALJIC Nos. 2.13 (evidence of a prior inconsistent statement should be used to evaluate witness's credibility) and 2.20 (factors to consider in evaluating witness's credibility). (*Murillo, supra*, 47 Cal.App.4th at p. 1108.)

Here, as in *Murillo*, the trial court charged the jury with CALJIC Nos. 2.13 and 2.20, as well as CALJIC Nos. 2.21.1 and 2.27. The instructions specified above "cover[ed] essentially the same ground" as CALJIC No. 2.21.2. (*Murillo, supra*, 47 Cal.App.4th at p. 1108.) We find these other instructions given to the jury adequately instructed it on the evaluation of witness credibility. Given the entirety of the instructions on how to evaluate witness credibility, there is no reasonable probability that a different result would have obtained had the court given CALJIC No. 2.21.2. (*Murillo*, at p. 1108.) Any error in omitting CALJIC No. 2.21.2 was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837.)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.